COMMONWEALTH OF KENTUCKY,
DEPARTMENT OF EDUCATION,
Petitioner,

v.

SECRETARY OF EDUCATION, UNIT-
ED STATES DEPARTMENT OF
EDUCATION, Respondent.

No. 82–3319.

United States Court of Appeals,
Sixth Circuit.

Argued June 13, 1983.

Decided Sept. 14, 1983.

Rehearing and Rehearing En Banc
Denied Dec. 5, 1983.

Robert L. Chenoweth, Asst. Deputy Atty. Gen., and Chief Counsel (argued), Edward L. Fossett, Dept. of Educ., Frankfort, Ky., for petitioner.

Terrel H. Bell, Secretary of Educ., Dept. of Educ., Stephen H. Freid (Lead Counsel) (argued), Arnold Rosenthal, U.S. Dept. of Educ., Washington, D.C., for respondent.

Before MERRITT and KENNEDY, Circuit Judges, and WEICK, Senior Circuit Judge.

CORNELIA G. KENNEDY, Circuit Judge.

The Commonwealth of Kentucky, Department of Education (Commonwealth), appeals from the March 19, 1982 decision of the Secretary of Education. ordering the Commonwealth to refund $338,034.00 allegedly misspent in Title I [1] programs during 1974. For the reasons set forth below, we reverse.

---

**1.** Title I of the Elementary and Secondary Education Act of 1965 (as amended) (ESEA), 20 U.S.C. §§ 241a, *et seq.*

The former United States Department of Health, Education and Welfare, through its Department of Health, Education and Welfare Audit Agency (HEWAA), conducted an audit of Title I expenditures of local educational agencies (LEAs) in the Commonwealth. The period covered by the audit was July 1, 1967, through June 30, 1974, with the last phase of the audit having been concluded in September of 1974. The audit report charged *inter alia* that the Title I "readiness programs" instituted with the approval of the Kentucky Department of Education in 50 local school districts supplanted State and locally funded programs in violation of 20 U.S.C. § 241e(a)(3)(B)[2] which requires:

> Federal funds made available under this subchapter will be so *used* (i) *as to supplement* and, to the extent practical, increase the level of funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs and projects assisted under this subchapter, *and* (ii) *in no case, as to supplant* such funds from non-Federal sources, * * * (emphasis added).

The HEWAA determination required a refund from the Commonwealth for fiscal year 1974 of $704,237.00.[3]

The Commonwealth made an application for review of this final determination in January 1977, and in the latter part of 1979 a three-member Education Appeal Board (EAB) panel was appointed to consider the matter. The Initial Decision of the EAB, issued on June 23, 1981, ruled "that the readiness programs carried out by the 50 LEAs during [Fiscal Year] 1974 were not properly designed to supplement state and local expenditures for Title I children, that a supplanting violation had occurred, and that the full $704,237.00 must be refunded

by the [state educational agency] SEA to the Assistant Secretary."

Pursuant to 20 U.S.C. § 1234a(d) the Commonwealth was notified that the initial decision would become the final decision of the United States Department of Education unless the Secretary of Education, for good cause shown, modified or set aside the EAB's decision. On August 27, 1981, in response to comments and recommendations filed by the Commonwealth and the United States Assistant Secretary for Elementary and Secondary Education, the Secretary of Education, Terrel H. Bell, remanded the audit to the EAB for further consideration. Secretary Bell instructed the EAB to determine whether the amount of $740,237.00 should be reduced in view of several factors including the more favorable pupil:teacher ratio in the readiness classes (13:1) as compared with that in the regular classes (27:1).

The EAB panel affirmed its earlier decision, but 'for good cause shown' Secretary Bell on review reduced the audit figure by 52%, representing the supplemental services received by students in the Title I readiness programs as a result of the significantly smaller pupil:teacher ratio. The amount ordered to be refunded by the Commonwealth was thus reduced to $338,034.00.

I.

■ On appeal to this Court, the Commonwealth argues that the Secretary did not have any authority to consider and make demand for a refund of Title I funds which had purportedly been misspent in 1974. As originally enacted, the ESEA did not expressly authorize the Secretary to demand a refund of misspent Title I funds. It was not until the Education Amendments of 1978, 20 U.S.C. § 2835, that provisions

---

**2.** The "supplanting" provision was added to Title I by an amendment enacted in 1970— Pub.L. 91–230, § 109(a).

**3.**

    1109 (students in readiness classes in 50 LEAs expected to be promoted to the next grade level in the subsequent school year and, thus, expected to receive first or second grade credit for the time spent in the readiness program)

    x   $635.02   (cost per student)
    ─────────────────
    $704,237.00

were adopted authorizing audit determinations and the collection from SEAs of Title I funds found to have been misspent. Accordingly, it is argued that the Secretary exceeded his statutory authority in ordering this refund.

This argument was definitively rejected by the Supreme Court in the recent decision of *Terrel H. Bell, Secretary of Education v. New Jersey and Pennsylvania,* —— U.S. ——, 103 S.Ct. 2187, 76 L.Ed.2d 313 (1983). There the Court held that the federal government has had, from the inception of the Act, the authority to recover misspent funds from states which had received grants under Title I. Eight Justices reasoned that although the authority of the Secretary to recover misspent funds did not become explicit until the Education Amendments of 1978, the pre-1978 version of ESEA contemplated that states misusing federal funds would incur a debt to the federal government for the amount misused.[4] Accordingly, if supplanting occurred, the Secretary has the authority to order a refund.

## II.

■ The Commonwealth argues in the alternative that even if the Secretary has the authority to order this refund, the record does not justify the determination that a supplanting, rather than a supplementing, of State and local funds occurred during fiscal year 1974. It is unclear what standard this Court should employ in reviewing the determination of the Secretary. As noted by Justice White in his concurring opinion in *Bell,* the cases reviewed in that decision

> ... do *not* involve any question as to the substantive standard by which a claim that a recipient has violated its Title I commitments is to be judged. Rather, they concern the abstract question whether the Secretary has the right to recover Title I funds under any circumstances. *In my view, there is a significant issue whether a State can be re-*

*quired to repay* if it has committed *no more than a technical violation of the agreement* or *if the claim of violation rests on a new regulation or construction of the statute issued after the state entered the program and had its plan approved.* (emphasis added)

*Id.,* at ——, 103 S.Ct. at 2199. In the instant case, we must address this "significant issue" left open in *Bell.* The only guidance provided by the majority in *Bell* appears at p. ——, 103 S.Ct. at p. 2198:

> [T]he States have an opportunity to litigate in the courts of appeal whether the findings of the Secretary are supported by substantial evidence and *reflect application of the proper legal standards.* § 455, 20 U.S.C. § 1234d(c); 5 U.S.C. § 706 (emphasis added).

Title I establishes financial support for LEAs to meet the special educational needs of educationally deprived children residing in school attendance areas having high concentrations of children from low income families. Congress provided that Title I funds were to be distributed to LEAs through SEAs upon application for the funds. The Commonwealth's programs were administered through the Kentucky Department of Education. The implementing rules and regulations in effect in fiscal year 1974 reinforced the statutory requirement that Title I funds should not supplant State or local funds and should supplement those funds. 45 C.F.R. § 116.17(h) (1971) (transferred to 34 C.F.R. pt. 200) of the regulations provides in pertinent part:

> Each application for a grant under Title I of the Act for educationally deprived children residing in a project area shall contain an assurance that the use of the grant funds will not result in a decrease in the use for educationally deprived children residing in that project area of State or local funds which, in the absence of funds under Title I of the Act, would be made available for that project area and that neither the project area nor the educationally deprived children residing

---

4. Justice White, concurring, would have preferred to have held that the 1978 amendments, which unequivocally allow for repayments, should be applied retroactively.

therein will otherwise be penalized in the application of State and local funds because of such a use of funds under Title I of the Act. No project under Title I of the Act will be deemed to have been designed to meet the special educational needs of educationally deprived children unless the Federal funds made available for that project (1) will be used to supplement, and to the extent practical increase, the level of State and local funds that would, in the absence of such Federal funds, be made available for the education of pupils participating in that project; (2) will not be used to supplant State and local funds available for the education of such pupils; and (3) will not be used to provide instructional or auxiliary services in project area schools that are ordinarily provided with State and local funds to children in nonproject area schools.

The Commonwealth argues that no supplanting took place when it designed self-contained readiness classrooms. The Commonwealth points out that Title I readiness classrooms were not approved by the Kentucky Department of Education unless the LEAs maintained the same number of State and locally funded regular classroom teachers as they had before the readiness programs were established. Thus, from the LEAs' standpoint they were supplementing the existing programs since their expenditures for existing regular classroom programs remained at the same level. By the same token they were not supplanting any of their existing programs or expenditures with the Title I self-contained classrooms. The Secretary counters:

We interpret the ... regulations to mean that the advent of Title I funds shall not result in a decrease in the use of

State and local support for the education of the educationally deprived children residing in the project area. The SEA officials viewed supplanting as the failure of an LEA to employ the number of non-Title I teachers that State and local funds were made available for, by school and grade, based on average daily attendance (ADA) statistics. The SEA's view does not relate to the per pupil expenditure and does not give the Title I student his fair share of services purchased with State and local funds. Further, the concept of a readiness program is to primarily prepare a child for the first grade. However, the SEA's view permits the use of the readiness class to serve as a general educational first grade.

(Report on Review of Administration of the ESEA of 1975 Title I Projects at LEAs Administered by the Kentucky Department of Education for the Period July 1, 1967 through June 30, 1974, p. 28; JA: 34). Thus, the Secretary focuses on the expenditure per pupil.[5]

In its initial decision the EAB wrote: The SEA devoted most of its evidence and much of its argument to proving that State and local fiscal effort was maintained at the school district, school and grade levels. The Assistant Secretary does not dispute this showing but considers it irrelevant, asserting that compliance must be judged with reference to State and local funds expended for the benefit of the specific pupils enrolled in readiness classes.

(Initial Decision of the EAB, June 23, 1981, at p. 8; JA: 69).

It cannot be said that the interpretation posited by the Secretary is "unreasonable."[6] The statutory and regulatory pro-

---

**5.** It is interesting to note that it is the success of the program which causes the problem. It is only when the child is able to advance to the regular classroom in the next grade that repayment is required. No reimbursement is required for those children who return to the regular first grade classroom.

**6.** Generally, when neither legislative history nor other decisions of the Secretary definitively

interpret the language of an ambiguous statute, courts will defer to the interpretation advanced by the agency empowered to administer the statute. *See United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977). *See also Meade Tp. v. Andrus,* 695 F.2d 1006, 1009 (6th Cir.1982) (where this Court wrote that the interpretation of a statute by the agency charged with its enforcement is entitled to " 'more than mere deference or

hibitions against supplanting State and local funds with Title I funds can reasonably be applied with reference to expenditures at the level of the individual educationally deprived pupil, rather than at the level of either the LEA, the school, the grade, or the classroom. Nonetheless, in the instant case we do not feel that it is our task on appeal to review the reasonableness of the Secretary's interpretation of Title I section 241e(a)(3)(B) and regulation section 116.17(h).[7] We are not reviewing with reference to the future effect of the Secretary's interpretation of a statute. Rather, in this appeal we are concerned with the fairness of imposing sanctions upon the Commonwealth of Kentucky for its "failure to substantially comply"[8] with the requirements of section 241e(a)(3)(B) and 45 C.F.R. 116.17(h), as those requirements were ultimately interpreted by the Secretary.

We disagree with the Secretary's conclusion that the statutory and regulatory provisions at issue were sufficiently clear to apprise the Commonwealth of its responsibilities under the Act.[9] It cannot be inferred that the Commonwealth had notice of its obligations.[10] The legislative history to Title I is replete with evidence that Congress left to the discretion of the participating States the responsibility to establish programs with Title I funds to strengthen educational opportunities for educationally deprived children.

---

weight. (The regulation) can only be set aside if the Secretary exceeded his statutory authority or if (it) is arbitrary, capricious, or otherwise not in accordance with law.' *Batterton v. Francis*, 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977); 5 U.S.C. § 706(2)(A)."); *Satty v. Nashville Gas Co.*, 522 F.2d 850, 854 (6th Cir.1975), *aff'd in part, vacated in part, and remanded,* 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977) (where this Court articulated the standard as one where "absent clear indicia in the form of legislative history that the agency interpretation is unreasonable or unnatural, we must defer to the commissioner's construction of the statute . . .").

7. *Contra, State of W. Va. v. Secretary of Ed.,* 667 F.2d 417, 420 (4th Cir.1981) (per curiam) (where, in resolving a dispute over ambiguity in the ESEA and regulations, the Fourth Circuit deferred to the interpretation advanced by the Secretary and affirmed the order of the Secretary requiring West Virginia to refund $125,000 misspent on the construction of an administrative office complex).

8. *See* 20 U.S.C. § 1234b(a) and § 1234c(a) (1978) (where the Commissioner is said to act upon the belief that a recipient of funds had "failed to comply substantially" with any requirement of law applicable to such funds).

9. In 1974, Congress adopted a further amendment to Title I, 20 U.S.C. § 241e(a)(1) (excess costs provision) in order to "reemphasize" that Title I funds were not to be used to supplant State and local funds. H.R.Rep. No. 805, 93rd Cong., 2d Session, 17, *reprinted in* [1974] U.S. Code Cong. & Admin.News 4093, 4108. We disagree with the Commonwealth's contention that, prior to the adoption of the 'excess costs' provision, Section 241e(a)(3)(B) could not reasonably be interpreted to prohibit supplanting with reference to expenditures at the level of

the individual educationally deprived student, and that, therefore, the Secretary is now attempting to retroactively enforce the 'excess costs' provision of the Act. However, the new provision makes it abundantly clear that Congress could have used language in the original enactment which would have been less ambiguous and would have more fairly apprised the State of its obligations.

10. The Initial Decision of the EAB, June 23, 1981, pp. 8–9; JA: 69–70 concluded:

The Panel is persuaded that *the statutory and regulatory provisions are sufficiently clear in their emphasis on the expenditure of funds for pupils*—not LEA's, schools or grade levels—to sustain the Assistant Secretary's position. Clause (B) of the statute [4] mandates the use of Federal funds to "supplement and . . . increase" the level of funding that would otherwise "be made available from non-Federal sources *for the education of pupils participating* in programs and projects" assisted by Title I (emphasis added [by Board] ).

The regulatory provision [5] is equally clear, even to the point of repetition. It requires assurances that use of grant funds not result in a decrease "in the use *for educationally deprived children*" of the State and local funds; that "educationally deprived children" not be penalized in the application of State and local funds; that Federal funds be used to supplement non-Federal funds that would, absent Title I, "be *made available for the education of pupils participating*" in Title I; and that Federal funds not supplant non-Federal funds "*available for the education of such pupils.*" (emphasis added [by Board] ).

---

[4] 20 U.S.C. § 241e(a)(3)(B) . . .
[5] 45 C.F.R. 116.17(h) . . .

Under the terms of the legislation, a local public school district may use funds granted to it for the broad purpose of programs and projects which will meet the educational needs of educationally deprived children in those school attendance areas in the district having high concentrations of children from low-income families. *It is the intention of the proposed legislation not to prescribe the specific types of programs or projects that will be required in school districts. Rather, such matters are left to the discretion and judgment of the local public educational agencies since educational needs and requirements for strengthening educational opportunities for educationally deprived elementary and secondary school pupils will vary from State to State and district to district.* What might be an acceptable and effective program in a school district serving a rural area may be entirely inappropriate for a school district serving an urban area, and vice versa. There may be circumstances where a whole school system is basically a low-income area and the best approach in meeting the needs of educationally deprived children would be to upgrade the regular program. On the other hand, in many areas the needs of educationally deprived children will not be satisfied by such an approach.

S.Rep. No. 146, *reported at* [1965] U.S.Cong. & Admin.News 1446, 1454.

It should be emphasized, . . . that no suggested program is in itself mandatory upon a public school authority. The selection of an appropriate program or programs, for which State educational authority approval is sought, rests with the local educational agency.

Id., at 1456–57.

This is not to say that the interpretation of the statutory and regulatory requirements posited by the Commonwealth is controlling. On the contrary, the interpretation of the Secretary governs all future dealings. We hold only that in the absence of unambiguous statutory and regulatory requirements, and in the presence of a specific grant of discretion to the Commonwealth to develop and administer programs it believes to be consistent with the intentions of Title I, it is unfair for the Secretary to assess a penalty against the Commonwealth for its purported failure to comply substantially with the requirements of law, where there is no evidence of bad faith and the Commonwealth's program complies with a reasonable interpretation of the law.[11]

We find support for this position in *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539, 67 L.Ed.2d 694 (1981), where the Supreme Court analyzed Congress' power to place conditions on the grant of federal funds to States under the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 89 Stat. 486, as amended, 42 U.S.C. § 6000 *et seq.* (1976 ed. and Supp. III).

Turning to Congress' power to legislate pursuant to the spending power, our cases have long recognized that Congress may fix the terms on which it shall disburse federal money to the States. See *e.g., Oklahoma v. CSC,* 330 U.S. 127 [67 S.Ct. 544, 91 L.Ed. 794] (1947); *King v. Smith,* 392 U.S. 309 [88 S.Ct. 2128, 20 L.Ed.2d 1118] (1968); *Rosado v. Wyman,* 397 U.S. 397 [90 S.Ct. 1207, 25 L.Ed.2d 442] (1970). Unlike legislation enacted under § 5 [of the Fourteenth Amendment], however, *legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract."* See *Steward Machine Co. v. Davis,* 301 U.S. 548, 585–598 [57 S.Ct. 883, 890–895, 81 L.Ed. 1279] (1937); *Harris v. McRae,* 448 U.S. 297 [100 S.Ct. 2671, 65 L.Ed.2d 784] (1980). *There can, of course, be no know-*

---

**11.** *Compare Alexander v. Califano,* 432 F.Supp. 1182 (N.D.Cal.1977) (where Title I funds were found to "supplant" in violation of § 241e(a)(3)(B)).

*ing acceptance if a State is unaware of the conditions or is unable to ascertain what it expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.* (footnote omitted) *Cf. Employees v. Department of Public Health and Welfare,* 411 U.S. 279, 285 [93 S.Ct. 1614, 1618, 36 L.Ed.2d 251] (1973); *Edelman v. Jordan,* 415 U.S. 651 [94 S.Ct. 1347, 39 L.Ed.2d 662] (1974). *By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation.* (emphasis added)

*Pennhurst*'s requirement of legislative clarity arose in the context of imposing upon participating States an unexpected condition for compliance—interpreting the Act to impose a duty on the States to provide the "least restrictive treatment" possible to severely or profoundly mentally and physically handicapped individuals. *See Bell, supra,* —— U.S. at ——–——, n. 17, 103 S.Ct. at 2197, n. 17. Declining to suppose that Congress intended to implicitly impose such an extensive obligation on participating States the Supreme Court wrote:

> Our conclusion is also buttressed by the rule of statutory construction established above, that Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds. That canon applies with greatest force where, as here, a State's potential obligations under the Act are largely indeterminate. It is difficult to know what is meant by providing "appropriate treatment" in the "least restrictive" setting, and it is unlikely that a State would have accepted federal funds had it known it would be bound to provide such treatment. *The crucial inquiry, however, is not whether a State would knowingly undertake that obligation, but whether Congress spoke so clearly that we can fairly say that the State could make an informed choice.*

*Pennhurst, supra,* 451 U.S. at 24–25, 101 S.Ct. at 1543–1544 (emphasis added). *See*

*also Board of Education of the Hendrick Hudson Central School District Bd. of Ed., Westchester County v. Rowley,* 458 U.S. 176, 204 n. 26, 102 S.Ct. 3034, 3049 n. 26, 73 L.Ed.2d 690 (1982) (where it was held that the phrase "free appropriate public education," in the Education for All Handicapped Children Act of 1975, 20 U.S.C. § 1401 *et seq.,* should not be read to impose upon States the requirement to maximize the potential of handicapped children, and that even if such was Congress' intent, its failure to clearly articulate that requirement precludes an interpretation of the Act that imposes such a burden upon States receiving federal funds); and *State of Louisiana, Dept. of Health and Human Services v. Block,* 694 F.2d 430, 431 n. 2 (5th Cir. 1982) (where *Pennhurst, supra,* and *New Jersey v. Hufstedler,* 662 F.2d 208 (3d Cir. 1981), *rev'd on other grounds sub nom. Terrel H. Bell, Secretary of Education v. New Jersey and Pennsylvania,* —— U.S. ——, 103 S.Ct. 2187, 76 L.Ed.2d 313 (1983) were cited for the proposition that legislative clarity is required when seeking to impose a heavy, affirmative burden upon states receiving federal funds).

The statute and the regulations at issue here are concerned not only with the welfare of pupils but also with the policy that Title I programs should not impact adversely on the project area. From the practical standpoint of the school district, although there is a correlation between the number of students and classrooms and the number of teachers required, a reduction in students does not always result in a savings to the school district. Only a reduction in faculty or facilities can bring about a savings. Given a fixed number of dollars awarded to the school district, the requirement that average per pupil expenditures be transferred to the Title I classrooms, in proportion to the number of students in attendance there who are expected to advance a grade, cannot help but have an adverse impact on the funds available for the regular classroom when the number of regular classrooms and teachers cannot be reduced.

Where, as here, a determination of whether Title I funds supplant or supple-

ment State and local funds depends upon whether the focus is on the district or the pupil, the statute and regulations cannot be said to be unambiguous. We cannot say that the Commonwealth received these funds with the "knowing acceptance" required by *Pennhurst.* The Commonwealth was unaware of the condition that the Secretary now seeks to impose.

Accordingly, we find that the Secretary was not justified in assessing a penalty against the Commonwealth for its purported failure to comply substantially with the requirements of 20 U.S.C. § 241e(a)(3)(B).

### III.

The Commonwealth finally asserts that the HEWAA assessed damages through a series of estimates and that such deficiencies in the auditors' methodology renders the assessment of damages arbitrary and capricious. Having concluded that it is unfair for the Secretary to find that the Commonwealth failed to comply substantially with the requirements of Title I, we need not address the issue of what damages would be appropriate under a contrary holding.

Accordingly, the decision of the Secretary is reversed.