BENNETT, SECRETARY OF EDUCATION *v.* KEN-
TUCKY DEPARTMENT OF EDUCATION

No. 83–1798.   Argued January 8, 1985—Decided March 19, 1985

O'CONNOR, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, REHNQUIST, and STEVENS, JJ., joined, and in Parts I, II, IV, and V of which WHITE and BLACKMUN, JJ., joined. POWELL, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Geller* argued the cause for petitioner. With him on the briefs were *Solicitor General Lee* and *Harriet S. Shapiro*.

*Robert L. Chenoweth*, Assistant Deputy Attorney General of Kentucky, argued the cause for respondent. With him on the brief was *David L. Armstrong*, Attorney General.*

JUSTICE O'CONNOR delivered the opinion of the Court.†

This case, like *Bennett* v. *New Jersey, ante*, p. 632, concerns an effort by the Federal Government to recover Title I funds that were allegedly misused by a State. There is no contention here that changes in statutory provisions should apply to previous grants. Instead, the dispute is whether the Secretary correctly demanded repayment based on a determination that Kentucky violated requirements that Title I funds be used to supplement, and not to supplant, state and local expenditures for education. Although the Court of Appeals for the Sixth Circuit found that the Secretary's determination was based on a reasonable inter-

---

*\*Fred H. Fishman, Robert H. Kapp, Norman Redlich, William L. Robinson*, and *Norman J. Chachkin* filed a brief for the Lawyers' Committee for Civil Rights Under Law as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of Texas et al. by *Richard L. Arnett, Jim Mattox*, Attorney General of Texas, *David Richards*, Executive Assistant Attorney General, *J. Patrick Wiseman*, Assistant Attorney General, *Thomas J. Miller*, Attorney General of Iowa, *Stephen H. Sachs*, Attorney General of Maryland, *Paul L. Douglas*, Attorney General of Nebraska, *Brian McKay*, Attorney General of Nevada, *William E. Isaeff*, Chief Deputy Attorney General, and *L. Duane Woodard*, Attorney General of Colorado; and for the National Association of Counties et al. by *Joyce Holmes Benjamin* and *Stewart A. Baker*.

†JUSTICE WHITE and JUSTICE BLACKMUN join only Parts I, II, IV, and V of this opinion.

pretation of Title I and its implementing regulations, the court nonetheless excused the State from repayment on the grounds that there was no evidence of bad faith and the State's programs complied with a reasonable interpretation of the law. *Kentucky* v. *Secretary of Education,* 717 F. 2d 943, 948 (1983). We granted certiorari, 469 U. S. 814 (1984), and because we disagree with the standard adopted by the Court of Appeals, we reverse.

## I

As explained more fully in *Bennett* v. *New Jersey, ante,* at 634–636, Title I of the Elementary and Secondary Education Act of 1965, Pub. L. 89–10, 79 Stat. 27, as amended, 20 U. S. C. § 2701 *et seq.,* provided federal grants to support compensatory education programs for disadvantaged children. In order to assure that federal funds would be used to support additional services that would not otherwise be available, the Title I program from the outset prohibited the use of federal grants merely to replace state and local expenditures. This prohibition initially was contained in regulations, see 45 CFR § 116.17(f) (1966); 45 CFR § 116.17(h) (1968), and explained in a program guide distributed to state education agencies. Office of Education, Title I Program Guide No. 44, ¶¶ 4.1, 7.1 (1968). Despite the regulations, the Office of Education[1] received public complaints that Title I funds were being used to replace state and local funds that otherwise would have been spent for participating children. See S. Rep. No. 91–634, pp. 9–10 (1970). Congress responded by amending Title I in 1970 to add a provision that specifically prohibited supplanting. *Id.,* at 9–10, 14–15.

---

[1] The Office of Education was the predecessor to the present Department of Education and was responsible for the administration of Title I until 1980. See *Bell* v. *New Jersey,* 461 U. S. 773, 776, n. 1 (1983). Unless the distinction is significant, we will refer to both the Office of Education and the Department of Education as the Department. *Ibid.*

That provision, in effect when the grants involved in this case were made, required that Title I funds be used

> "(i) as to supplement and, to the extent practical, increase the level of funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs and projects assisted under this subchapter, and (ii) in no case, as to supplant such funds from non-Federal sources."   20 U. S. C. § 241e(a)(3)(B) (1970 ed.).

Title I regulations elaborated upon the statutory prohibition on the use of federal funds to supplant state and local funds:

> "Each application for a grant . . . shall contain an assurance that the use of the grant funds will not result in a decrease in the use for educationally deprived children residing in that project area of State or local funds, which, in the absence of funds under Title I of the Act, would be made available for that project area and that neither the project area nor the educationally deprived children residing therein will otherwise be penalized in the application of State and local funds because of such a use of funds under Title I of the Act. . . . Federal funds made available . . . (1) will be used to supplement, and to the extent practical increase, the level of State and local funds that would, in the absence of such Federal funds, be made available for the education of pupils participating in that project; (2) will not be used to supplant State and local funds available for the education of such pupils."   45 CFR § 116.17(h) (1974).

In 1976, federal auditors found that Kentucky had approved Title I programs for fiscal year 1974 that violated the prohibitions on supplanting.   App. 11–21.   The disputed programs involved "readiness classes" offered by 50 local education agencies for educationally disadvantaged children

in place of regular first- and second-grade classes. App. to Pet. for Cert. 22a. Participating students received their entire academic instruction in the readiness classes, and a substantial number of the students were expected to be promoted to the next higher grade level the following year. App. 16–17. Title I funds were used to pay all the instructional salaries and a portion of the administrative support costs for the readiness classes. App. to Pet. for Cert. 22a. Students in these classes did receive locally funded "enrichment services," *i. e.*, art, physical education, music, and library, that were available to students enrolled in regular classes. *Ibid.* It is not disputed, however, that Title I funds defrayed substantially all the costs of educating students in the readiness classes. App. 15, 17. The auditors concluded that supplanting of state and local expenditures had occurred for children in readiness classes who were promoted to the next higher regular grade. *Id.*, at 17, 19; App. to Pet. for Cert. 30a. Based on this finding, the auditors estimated that $704,237 in Title I funds had been misused, and the Department issued a final determination letter demanding repayment. App. 22–23.

Kentucky sought further administrative review. The Education Appeal Board (Board), after extensive proceedings, issued an initial decision in 1981 sustaining the auditors' findings. App. to Pet. for Cert. 17a–32a. The Board rejected the State's argument that the supplanting provisions were satisfied because state and local funding was not reduced for the school districts, schools, or grade levels involved. *Id.*, at 24a. The statutory and regulatory provisions, the Board concluded, clearly required that state and local expenditures be maintained for *pupils* participating in programs supported by Title I. *Id.*, at 24a–25a. On remand from the Secretary, *id.*, at 33a–35a, the Board reaffirmed its initial decision. *Id.*, at 36a–37a. The Secretary subsequently affirmed the Board's finding that supplanting had occurred, but reduced the demanded repayment to

$338,034 to reflect the benefits presumed to result from smaller pupil-teacher ratios in the readiness classes. *Id.*, at 38a–42a.

In reviewing the final order demanding repayment, the Court of Appeals acknowledged that the Secretary's interpretation of the supplanting prohibition was reasonable and would govern subsequent grants. 717 F. 2d, at 946–947, 948. Nonetheless, the court concluded that Kentucky was not liable for misusing Title I funds during fiscal year 1974. The Court of Appeals viewed the issue to be "the fairness of imposing sanctions upon the Commonwealth of Kentucky for its 'failure to substantially comply' with the requirements [of Title I]." *Id.*, at 947, quoting 20 U. S. C. §§ 1234b(a), 1234c(a). The statute and regulations concerning supplanting, the court maintained, were not "unambiguous." 717 F. 2d, at 948. Moreover, Congress specifically gave state and local officials discretion to develop particular programs to be supported by Title I funds. *Ibid.* In these circumstances, the Court of Appeals concluded that it would be unfair to assess a penalty against Kentucky where there was no evidence of bad faith and the disputed programs complied with a reasonable interpretation of the law. *Ibid.* Relying on *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981), the court further reasoned that the State did not accept Title I funds with "knowing acceptance" of the condition the Secretary now seeks to impose, and therefore the Federal Government was not justified in demanding repayment. 717 F. 2d, at 950.

## II

We note initially that the Court of Appeals erred in characterizing the issue to be the fairness of imposing sanctions against the State for its failure to comply substantially with the requirements of Title I. Although recovery of misused Title I funds clearly is intended to promote compliance with the requirements of the grant program, a demand for repay-

ment is more in the nature of an effort to collect upon a debt than a penal sanction. See *Bell* v. *New Jersey*, 461 U. S. 773, 782 (1983). The State gave certain assurances as a condition for receiving the federal funds, and if those assurances were not complied with, the Federal Government is entitled to recover amounts spent contrary to the terms of the grant agreement. *Id.*, at 791. More specifically, the State gave assurances that Title I funds would be used only for programs which had been reviewed and approved by the state education agency and which met applicable statutory and regulatory requirements. 20 U. S. C. § 241f(a)(1) (1976 ed.). The issue in this case is not the fairness of imposing punitive measures, but instead whether the Secretary properly determined that Kentucky failed to fulfill its assurances by approving programs that violated the requirements of Title I.

Because of the nature of the obligation to repay misused funds, we also disagree with the suggestion by the court below that substantial compliance with applicable legal requirements affects liability. The Court of Appeals relied on provisions which authorize the Secretary, pursuant to specified procedures, to withhold funds or to issue cease-and-desist orders if a recipient fails to comply substantially with the law. 20 U. S. C. §§ 1234b(a), 1234c(a). Cf. § 2836 (specific authority to withhold Title I funds). These references to substantial compliance in provisions governing prospective relief do not by their own terms apply to the recovery of misused funds. Cf. § 1234a(c) (filing of application by recipient for review of audit determination does not affect authority of Secretary to take other adverse actions); 124 Cong. Rec. 20612 (1978) (remarks of Rep. Corrada) (noting that postaudit recovery and withholding are distinct enforcement mechanisms). Other provisions that address the Secretary's authority to demand repayment do not limit liability to instances where there is failure to comply substantially with grant obligations. See §§ 1226a–1, 1234a, 2835(b). This silence cannot be ascribed to legislative inattention to the

details concerning recovery of misused funds. Congress specifically limited liability for repayment to expenditures made in the five years preceding the final written notice of liability and also authorized the Secretary, in certain circumstances, to settle claims involving less than $50,000. §§ 1234a(f), 1234a(g). Given the detailed provisions concerning audit determinations contained in § 1234a, we do not believe that Congress intended impliedly to engraft upon that section the "substantial compliance" standard expressly stated in §§ 1234b and 1234c for prospective relief.[2]

Nor do we think that the absence of bad faith absolves a State from liability if funds were in fact spent contrary to the terms of the grant agreement. In *Bell* v. *New Jersey* we explained that where a State obtains grants by providing assurances that the funds will be used on programs that comply with Title I, the State has no right to retain funds that are in fact misused. 461 U. S., at 787, 790–791. See also S. Rep. No. 91–634, at 10, 84 (assurances must be enforced and misused funds recovered). Our discussion in no way suggested that the "misuse" of Title I funds depended on any subjective intent attributable to grant recipients. Instead, *Bell* v. *New Jersey* indicates that funds were misused if the State did not fulfill its assurances that it would

---

[2] In *Bell* v. *New Jersey* we held that provisions in the 1978 Amendments expressly authorizing judicial review of final decisions by the Secretary or the Board applied retroactively. 461 U. S., at 777–778, and n. 3. We declined to decide, however, whether the provisions allowing the Secretary to recover misused funds were also retroactive, *id.*, at 782, because we held that § 415 of the General Education Provisions Act, Pub. L. 91–230, 84 Stat. 170, 20 U. S. C. § 1226a–1, created a right to impose liability on the States. 461 U. S., at 784, 791. Neither the language of § 415 nor *Bell* v. *New Jersey* suggests that the Secretary's right to recover is affected by a recipient's substantial compliance with the law. Given our conclusion that the references to substantial compliance in §§ 1234b and 1234c do not limit the right to repayment provided in § 1234a, we need not decide whether the latter section is remedial, rather than substantive, and thus retroactive. Cf. *Bennett* v. *New Jersey, ante,* at 637 (substantive standards of 1978 Amendments are not retroactive).

abide by the conditions of Title I. 461 U. S., at 790–791. Provisions of the 1978 Amendments clarifying the Secretary's right to recover misused funds also do not condition that right on a recipient's bad faith. Indeed, Congress expressly placed on the grantees the burden of "demonstrat[ing] the allowability of [disputed] expenditures" in proceedings before the Education Appeal Board. 20 U. S. C. § 1234a(b). There is no indication that grantees may avoid repayment by showing that improper expenditures were made in good faith.[3]

Finally, we do not agree that *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1 (1981), bars recovery of misused Title I funds because the State did not accept the grant with "knowing acceptance" of its terms. In *Pennhurst,* we rejected the argument that acceptance of federal grants under the Developmentally Disabled Assistance and Bill of Rights Act, 42 U. S. C. § 6000 *et seq.,* required States to provide mentally handicapped persons with appropriate treatment in the least restrictive environment. Such a requirement, we noted, would have imposed a "massive" and "largely indeterminate" financial obligation on the States. 451 U. S., at 24. We observed: "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or

---

[3] Although the view of a later Congress does not definitively establish the meaning of an earlier enactment, it does have some persuasive value. *Bell* v. *New Jersey,* 461 U. S., at 784–785. Accordingly, we note that Congress has rejected a proposal to amend the audit provisions to add a substantial compliance standard. See 130 Cong. Rec. H7902–H7903 (July 26, 1984) (§ 808(a) of H. R. 11); *id.,* at H10756 (Oct. 2, 1984) (deletion of § 808(a) in conference). Similarly, when a proposal to excuse liability for funds misused before 1978 was debated and ultimately defeated on a point of order, Members of Congress noted that the Department had sought repayment notwithstanding the absence of bad faith or fraud on the part of recipients. See 127 Cong. Rec. 10644 (1981) (remarks of Sen. Thurmond); *id.,* at 10646 (remarks of Sen. Stennis). These actions suggest that later Congresses understood that liability is not conditioned on substantial compliance or bad faith.

not to accept those funds." *Ibid.* The requisite clarity in this case is provided by Title I; States that chose to participate in the program agreed to abide by the requirements of Title I as a condition for receiving funds. *Bell* v. *New Jersey,* 461 U. S., at 790, and n. 17. There was no ambiguity with respect to this condition, and *Pennhurst* does not suggest that the Federal Government may recover misused *federal* funds only if every improper expenditure has been specifically identified and proscribed in advance.

## III

In reviewing a determination by the Secretary that a State has misused Title I funds, a court should consider whether the findings are supported by substantial evidence and reflect an application of the proper legal standards. *Bennett* v. *New Jersey, ante,* at 646; *Bell* v. *New Jersey, supra,* at 792. The disagreement in this case concerns whether the Secretary properly determined that the readiness programs approved by Kentucky violated assurances that Title I funds would be used to supplement state and local expenditures. The Government argues that a reviewing court should simply defer to the Secretary's interpretation of the requirements of Title I so long as it is reasonable. Without disputing the reasonableness of the interpretation advanced by the Secretary, Kentucky contends that because the grant program was in the nature of a contract, any ambiguities with respect to the obligations of the State must be resolved against the party who drafted the agreement, *i. e.,* the Federal Government. Thus, the parties dispute the fundamental nature of the obligations assumed under Title I: the Government suggests that the State guaranteed that the use of the funds would satisfy whatever interpretation of the program requirements the Secretary might reasonably adopt; the State argues that liability for the misuse of funds results only if grants were spent in violation of an unambiguous requirement.

The contentions of the parties can be properly evaluated only against the background of the actual operation of Title I. The grant program provided federal aid for compensatory education for disadvantaged children, but expressly left the selection and development of particular projects to local control. State education agencies approved program applications and monitored compliance by local school districts, obtained funds from the Federal Government, and subsequently channeled the money back to the local level. Thus, the States essentially served as conduits for what became a massive flow of federal funds. Title I grew from an annual appropriation of $959 million in 1966 to more than $3 billion by 1981, and assisted compensatory education programs in every State and in more than 14,000 school districts. See 2 U. S. Dept. of Education, Fiscal Year 1981 Annual Evaluation Report 3 (1981); National Institute of Education, Administration of Compensatory Education xiii (1977) (hereinafter NIE Report). During the period involved in this case, fiscal year 1974, Kentucky received more than $32 million in Title I funds. App. 11.

Although Congress in 1965 articulated the general goals of Title I, the statute and the initial regulations did not precisely outline the permissible means for implementing those goals. Uncertainty in this regard was compounded by the fact that during the first years following the passage of Title I, the Office of Education did not vigorously enforce the requirements of the program. See L. McDonnell & M. McLaughlin, Education Policy and the Role of the States 13, 90–91 (1982); Murphy, Title I of ESEA: The Politics of Implementing Federal Education Reform, 41 Harv. Ed. Rev. 35, 41–45 (1971). In 1970, Congress acknowledged that funds had been misused because of weaknesses in administration, and directed the Office of Education to strengthen its monitoring of the program requirements. S. Rep. No. 91–634, at 8–10. Management of Title I by the Office of Education improved during the 1970's, but problems in clarifying the

program requirements remained. See J. Berke & M. Kirst, Federal Aid to Education: Who Benefits? Who Governs? 377–378 (1972). Congress in 1974 directed the NIE to conduct a comprehensive 3-year study of federal compensatory education programs, including Title I. Pub. L. 93–380, § 821, 88 Stat. 599.

The NIE study was the primary impetus for the Education Amendments of 1978. In considering those Amendments, Congress noted evidence that the Office of Education was "implementing administrative requirements in a manner which is neither clear nor consistent, and that this inconsistency is confusing States and local education agencies about their obligations." H. R. Rep. No. 95–1137, p. 49, (1978); S. Rep. No. 95–856, p. 27 (1978). This confusion, Congress observed, resulted in part from the diffuse legal framework for Title I. In addition to the statutory provisions and the regulations, the Office of Education sent program guides to state education agencies explaining the requirements and their application to particular situations. Id., at 34; H. R. Rep. No. 95–1137, at 55. Office of Education Program Review teams visited local Title I projects and provided advice, and the Office also sent interpretative letters in response to state and local inquiries. NIE Report 18, 27; Office of Education, Title I Program Guide No. 24 (1968) (compilation of interpretative letters).

Congress accepted the NIE's conclusion that many of the questions concerning the requirements of Title I would be resolved if the various materials prepared by the Office of Education were "assembled, summarized, and interrelated." S. Rep. No. 95–856, at 34; H. R. Rep. No. 95–1137, at 55. Accordingly, the 1978 Amendments directed the agency to prepare a policy manual compiling the applicable statutes, regulations, advisory opinions, and other materials. 20 U. S. C. § 2837. Congress indicated that such a manual would help to "ensure that federal officials uniformly interpret, apply, and enforce Title I requirements throughout

the country." S. Rep. No. 95–856, at 138; H. R. Rep. No. 95–1137, at 161.  The NIE study and the extensive review of Title I's administration by Congress indicate that the requirements of the program, while not always clear, evolved and became more specific over time and were explained in materials beyond the statute and its implementing regulations.

Although we agree with the State that Title I grant agreements had a contractual aspect, see *Bennett* v. *New Jersey, ante,* at 638, the program cannot be viewed in the same manner as a bilateral contract governing a discrete transaction. Cf. *United States* v. *Seckinger,* 397 U. S. 203, 210 (1970) ("[A] contract should be construed most strongly against the drafter, which in this case was the United States").  Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.  See R. Cappalli, Rights and Remedies Under Federal Grants 53–55 (1979).  Title I, for example, involved multiple levels of government in a cooperative effort to use federal funds to support compensatory education for disadvantaged children.  The Federal Government established general guidelines for the allocation and use of funds, and the States agreed to follow those guidelines in approving and monitoring specific projects developed and operated at the local level.  Given the structure of the grant program, the Federal Government simply could not prospectively resolve every possible ambiguity concerning particular applications of the requirements of Title I.  Cf. *Heckler* v. *Community Health Services of Crawford County, Inc.,* 467 U. S. 51, 64 (1984).  Moreover, the fact that Title I was an ongoing, cooperative program meant that grant recipients had an opportunity to seek clarification of the program requirements.  Accordingly, we do not believe that ambiguities in the requirements should invariably be resolved against the Federal Government as the drafter of the grant agreement.

We find it unnecessary here to adopt the Government's suggestion that the Secretary may rely on any reasonable interpretation of the requirements of Title I to determine that previous expenditures violated the grant conditions. Our review of the operation of Title I explains how the States assumed an intermediary role in monitoring compliance with requirements that were not always clear. In this particular context, we are reluctant to conclude that the States guaranteed that their performance under the grant agreements would satisfy whatever interpretation of the terms might later be adopted by the Secretary, so long as that interpretation is not "arbitrary, capricious, or manifestly contrary to [Title I]." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 844 (1984). As we noted in *Bennett* v. *New Jersey, ante,* at 639, 646, the State agreed to comply with, and its liability is determined by, the legal requirements in place when the grants were made. Consequently, in evaluating past expenditures, the Secretary's interpretation of the requirements of Title I should be informed by the statutory provisions, regulations, and other guidelines provided by the Department at that time. As explained *infra,* we have no occasion in this case to address the circumstances, if any, in which the Secretary could impose liability for expenditures made in reliance upon an earlier interpretation provided by the Department, cf. *Bell* v. *New Jersey,* 461 U. S., at 794 (WHITE, J., concurring), or to decide if a State may be held liable where its interpretation of an ambiguous requirement is more reasonable than an interpretation advanced by the Secretary after the grants were made.

## IV

We agree with the Secretary that the readiness classes approved by Kentucky clearly violated existing statutory and regulatory provisions that prohibited supplanting. It is undisputed that Title I funds were used to pay substantially all

the costs for the basic education of students in the readiness classes. Absent these classes funded by Title I, the participating students would have received instruction in regular classes supported by state and local funds. Both the statutory provision and the implementing regulations expressly required that Title I funds not be used to supplant state and local funds for the *pupils* participating in Title I programs. The statute declared that Title I funds must be used "to supplement . . . the level of funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs and projects assisted under this subchapter, and . . . in no case, . . . to supplant such funds from non-Federal sources." 20 U. S. C. § 241e(a)(3)(B) (1970 ed.). The applicable regulation similarly provided: "Federal funds made available . . . will be used to supplement, and to the extent practical increase, the level of State and local funds that would . . . be made available for the education of pupils participating in that project [and] will not be used to supplant State and local funds available for the education of such pupils." 45 CFR § 116.17(h) (1974).

Based on the language of the statute and the regulation, we cannot agree that there was an ambiguity whether the supplanting prohibition would be satisfied if state and local funding was maintained at the level of the school district, school, or grade. Separate statutory provisions required that state and local spending not be reduced at the level of school districts, 20 U. S. C. § 241g(c)(2) (1970 ed.); 45 CFR § 116.45 (1974), or individual schools. 20 U. S. C. § 241e(a)(3)(C) (1970 ed.); 45 CFR § 116.26 (1974). See generally NIE Report 9–10 (explaining relationship of various provisions). Although funding was maintained at the level of particular grades, because Title I students were placed in separate classes supported by federal funds, the consequence was to increase per-pupil state and local expenditures for

students who remained in regular first- and second-grade classes. No plausible reading of the statute or regulations suggests that this result comports with the prohibitions on supplanting. As noted by the Board, if the State was uncertain on this point, it could have sought clarification from the Office of Education. App. to Pet. for Cert. 27a. In fact, the grant applications approved by the State expressly required the local school districts to explain:

> "How will you organize the program to assure that children participating in the component activity will receive this Title I service in addition to services to which they are ordinarily entitled from state and local school funds?" *Ibid.*

Kentucky, moreover, has not shown that the position now taken by the Secretary is inconsistent with earlier guidelines provided by the Department. The State notes that Office of Education Program Review teams visited schools in Kentucky in which the readiness classes were offered and made no objection to the classes. Nonetheless, Kentucky does not challenge the finding by the Education Appeal Board, see *id.*, at 23a, that there is no evidence in the record that the teams reviewed the financing of the readiness classes.[4] Kentucky further contends that the ambiguity of the supplanting provisions is demonstrated by the fact that the Secretary modified

---

[4] At oral argument before the Board, the State argued that some "measure of estoppel" should operate against the Department and moved to reopen the record to present additional evidence. The Board ruled that estoppel would not apply absent affirmative misconduct by the Government, and because Kentucky had not alleged such misconduct, it declined to reopen the record. App. to Pet. for Cert. 28a. The Court of Appeals did not discuss estoppel arguments, and Kentucky acknowledged before this Court that it was not making any estoppel claim. Tr. of Oral Arg. 39, 43. Accordingly, we do not address the application of the defense of estoppel. Cf. *Heckler* v. *Community Health Services of Crawford County, Inc.*, 467 U. S. 51, 60 (1984) (reserving issue of assertion by private party of estoppel against Government).

the Board's order to reduce the demanded repayment. This argument is unpersuasive. The modification reflects the Secretary's determination that Title I funds provided some additional benefits to the students in the readiness classes because the classes had smaller pupil-teacher ratios, but it does not cast any doubt on the Board's finding that supplanting occurred.

We note, finally, that the possibility that application of the supplanting provisions might be unclear in other contexts does not affect our resolution of this case. Congress, in considering the 1978 Amendments, observed that the supplanting regulations had been applied in an unclear and inconsistent manner. See H. R. Rep. No. 95–1137, at 29, 49; S. Rep. No. 95–856, at 15, 27. This situation resulted in part from debate within the Office of Education concerning the desirability and practicality of measuring supplanting at the level of expenditures upon individual students. See NIE Report 29–38. Difficult questions of interpretation may well arise in determining if a particular program violated the supplanting provisions, and we do not suggest that the prior position of the Department is irrelevant in this regard. We conclude, however, that the programs approved by Kentucky for fiscal year 1974 clearly violated then-existing requirements for Title I, and therefore neither ambiguity in the application of those requirements to other situations nor the policy debates that later arose within the Office of Education avail the State here.[5]

V

We hold that the Secretary properly determined that Kentucky violated its assurances by approving the readiness

---

[5] Because the disputed expenditures violated a substantive requirement concerning the use of Title I funds, we do not address in this case whether the Secretary could demand repayment for no more than a technical violation of a grant agreement. Cf. *Bell* v. *New Jersey,* 461 U. S., at 794 (WHITE, J., concurring).

classes and thereby misused funds received under Title I. Before the Court of Appeals, Kentucky also challenged the calculation of the amount to be repaid. The Court of Appeals did not address this argument, 717 F. 2d, at 950, and the State may renew its contentions in this regard on remand. Accordingly, the judgment below is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL took no part in the consideration or decision of this case.