**SAN JUAN CITY COLLEGE, INC., et al., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

No. 01–73C.

United States Court of Federal Claims.

Aug. 8, 2003.

Yolanda R. Gallegos, of Albuquerque, New Mexico for plaintiffs.

Hillary A. Stern, Commercial Litigation Branch, Civil Division, Department of Justice for defendant.

## OPINION

BRUGGINK, Judge.

This case arises out of an agreement between an education provider, plaintiff, San Juan City College ("SJCC"), and the Department of Education ("DOE") with respect to federal student financial aid payments. The agreement is unusual in that it is completely a creature of statutes and regulations-virtually all of the parties' respective rights and obligations are dictated by law. SJCC makes a compelling case that DOE breached the agreement, i.e., failed to comply with applicable regulations, by withholding funds from SJCC for six months without affording it a hearing. It also makes a powerful argument that, even though that termination was temporary, it foreseeably caused dramatic economic consequences to plaintiffs-to wit, closing of the school. The pending cross-motions for summary judgment pose the following question: does such an agreement, if breached by the agency, create the possibility for traditional breach of contract damages beyond those remedies imposed on the agency under applicable regulations? After oral argument and supplemental briefing, we conclude that the answer is "no."

## BACKGROUND [1]

SJCC is a private, for profit, post-secondary institution begun in 1977 and headquartered in Puerto Rico. Mr. Americo Reyes Morales, the other plaintiff, serves as President and CEO. Until it closed in 1996, SJCC provided educational programs, primarily to low-income students, through its main campus in Santurce and branch campuses in Juana Diaz and Arecibo, Puerto Rico. Beginning in 1984, SJCC participated in student financial aid programs authorized under Title IV,[2] including the Pell Grant Program under 20 U.S.C. § 1070a (2000). The school's participation commenced with the execution of a Program Participation Agreement ("Agreement") with DOE. The Agreement specifically incorporated governing statutes and implementing regulations for Title IV. Indeed, most of the terms of the agreement consist of references to SJCC's obligations under applicable statutes and regulations. There are virtually no provisions creating specific obligations in the agency. Defendant concedes, however, that the agreement functions as a legally-binding contract.

The current dispute focuses on events in 1995. For a two week period in February of that year, SJCC ceased to hold classes. This was the result of an unannounced visit on February 8, 1995 to campus offices by representatives of the Puerto Rico Departmento de Hacienda ("PRTD") (Puerto Rico's office for tax matters). The purpose of the arrival was to conduct an inventory of SJCC in connection with an alleged tax debt.[3] The PRTD placed pad locks on the doors of the school, causing it to suspend classes for a total of 11 working days from February 8 through February 25. The students were told to leave and SJCC's premises were largely vacated. The students returned on February 25, and the classes missed during that time were later made up by extending the term. SJCC did not inform DOE or the Puerto Rico education department, Consejo General de Educacion de Puerto Rico ("Consejo"), of these developments at that time.

There is a dispute as to how DOE first became aware of the suspension of classes at SJCC.[4] It need not be resolved. What is

---

1. Plaintiffs contend that summary judgment cannot be granted in favor of defendant because there are disputes of material fact with respect to whether the breach caused damage. Because we believe the undisputed facts are sufficient to decide whether the asserted damages are recoverable as a matter of law, the matter is ripe for summary judgment.

2. Higher Education Act, Pub.L. No. 89–329, 79 Stat. 1219 (1965) (codified as amended, 20 U.S.C. §§ 1070 *et seq.*).

3. The parties dispute the exact amount of this debt. Defendant asserts it was $300,000. Plaintiffs allege that amount is inflated and includes projected interest and penalties. The exact amount owed to PRTD is not material to our resolution of this matter, however.

4. Initially, defendant claimed it received information from the Consejo. This assertion is reflected in its letter from Mr. McKiernan to SJCC dated February 14, 1995, informing SJCC regarding its duties as an institution which is no

undisputed is that Mr. Robert McKiernan, DOE's Chief of Institutional Review Branch, became aware that there was a lock on the door of SJCC and directed Mr. Felix Lugo, an institutional review specialist, to send a "closed school letter" to SJCC. The letter, dated February 14, 1995, stated that DOE had been "advised by [Consejo] that [SJCC] ceased operations at all its branches effective on February 6, 1995." The significance of this perceived fact to DOE was that Article X, paragraph 2 of the Agreement states that "the date the institution no longer qualifies as an eligible institution" is one triggering date for the termination of the Agreement, pursuant to 34 C.F.R. § 668.14(h)(2) (1995). The DOE takes the position that, under 34 C.F.R. § 668.26(a)(1), the institution no longer qualified for participation when it "close[d] or stop[ped] providing educational programs for a reason other than a normal vacation period or a natural disaster . . . ."

The letter makes plain that DOE was operating on the assumption that the school had elected to close, i.e., cease offering classes, permanently. The purpose of the letter, therefore, was to:

> (1) inform the institution of its rights and responsibilities to the Title IV programs when it closes or stops providing educational instruction (2) Provide the institution with instructions for the return of unobligated Title IV funds, and (3) Provide instructions for the delivery of committed funds to those students enrolled at the institution during the payment period in which the institution closed.

The letter outlined the requirements of 34 C.F.R. § 668.25, which deals with the responsibilities of a closed school. SJCC had to respond within 45 days.

The letter indicates that it was to be sent by certified mail, return receipt requested. Defendant has not produced the return receipt. While it is undisputed that Mr. McKiernan drafted the letter dated February 14, 1995, it is also undisputed that· the original letter was not received by SJCC. Defendant does not dispute the deposition testimony of Ms. Leido Blanco, an employee of SJCC, that she did not receive the letter until after requesting a copy from Mr. McKiernan, sometime after February 27, 1995. We will assume, for purposes of addressing defendant's motion, that the letter was not received timely.

Some time after the closed school letter was drafted by Mr. McKiernan, SJCC was placed on DOE's "closed school" list.[5] As a result, processing of SJCC reimbursement requests were halted. Subsequently, a memo was issued on March 22, 1995 instructing DOE's Financial Operations Division to withhold all Title IV funds ("freeze memo").[6] The memo was a "request"[7] "that the authority of the above institution [SJCC] to draw further funds be withheld: INSTITUTION CLOSED EFFECTIVE FEBRUARY 6, 1995." The school was unaware of these events, although it soon became aware that monies were no longer forthcoming.

On February 27, 1995 the locks were removed from SJCC's doors and classes resumed. Some time after SJCC was placed on the closed school list and classes had resumed, Ms. Blanco called Mr. Gilbert, a DOE employee in the enforcement and compliance division, to enquire about funding and

---

longer providing educational programs. Nothing in the record supports this contention and plaintiffs vigorously contest it. Defendant later asserted that Mr. Lugo personally observed the lock and chain on the doors of SJCC prior to February 14, 2003. However, plaintiffs argue that his testimony is internally inconsistent as to the time of this event. Plaintiffs cite a letter which states that the meeting between President Reyes Morales and Mr. Lugo took place on March 3, 2003, after the locks had been removed.

5. Kristine Luken, an employee at DOE, filled out the requisite form for placing SJCC on the closed school list. There is nothing on this form which

indicates the exact date that SJCC was placed on the closed school list. It does indicate that Ms. Luken was told that the school's status as closed had been verified on March 3, 1995.

6. The parties dispute whether it was due to a program review or the freeze memo that DOE ceased processing SJCC's reimbursement requests. The dispute is not material.

7. It is unclear from the freeze memo whether this was truly a request or an order. It is clear, in any event, that SJCC's reimbursement requests were no longer processed.

was advised that in order to begin receiving funds again the school should seek recertification to participate in Title IV programs. SJCC received the appropriate forms from DOE, but did not initiate the re-certification process.

As soon as it became aware that its name was on the closed school list, SJCC began challenging that designation. SJCC contacted Mr. Osvaldo Feliu Miranda, director of the Offices of Licenses for the Consejo. In a March 23, 1995 letter, SJCC informed him that SJCC had not closed. Instead it had taken a brief academic recess. SJCC sent a copy of this letter to Mr. McKiernan and Mr. Lugo. Mr. Feliu Miranda assured SJCC in a letter dated March 24, 1995 that the decisions of DOE were not based on information received from Consejo. Furthermore, Mr. Feliu Miranda informed DOE in an April 27, 1995 letter that Consejo did not, and had not, considered SJCC closed. DOE continued to treat SJCC as closed, however.

Throughout March, April, May and June, SJCC called and wrote various DOE employees to inform them that SJCC was not closed. Mr. Reyes Morales wrote a letter directly to Mr. Lugo on April 3, 1995, informing him of the status of SJCC. Counsel for plaintiffs also wrote Mr. McKiernon on May 25, 1995 and Mr. Robert Jamroz, then the Acting Director of the Institutional Participation Division for DOE, on June 12, 1995 attempting to clarify SJCC's status. DOE continued to treat SJCC as a closed school.

Ms. Luken, an employee for DOE, affirmed that it was her responsibility, in the event of a discrepancy between what the school and another source reported, to investigate. However, there is no evidence that any DOE employee independently verified the claim that SJCC had resumed classes until late June. On June 16, 1995 Congressman Carlos Romero–Barceló wrote the then-Secretary of Education, Richard W. Riley, calling the Secretary's attention to the fact that DOE considered SJCC closed. On July

10, 1995, DOE advised SJCC that it had confirmed that the closure was only temporary and that SJCC had re-opened. DOE thereafter removed SJCC from the closed school list and once again began providing SJCC with funds.

Plaintiffs, SJCC and Mr. Reyes Morales, filed this action on February 13, 2001, claiming breach of contract, violation of the Higher Education Act, and violation of the Fifth Amendment. They seek the opportunity to put on evidence that the government's asserted breach of contract foreseeably resulted in closure of the school and associated substantial economic injury.

## DISCUSSION

Before addressing the breach of contract claim,[8] we consider the contention that DOE violated "Plaintiffs' due process rights under the Fifth Amendment to the Constitution by terminating SJCC's participation in Title IV programs by withholding Title IV funds without providing SJCC with a Subpart G hearing." Pl. Brief of Sept. 24, 2002, at 2. This claim can be disposed of quickly. There is no such cause of action, at least in this court. Plaintiffs' due process rights do not translate into money damages.[9] The appropriate relief for violation of due process rights is equitable, and only available in district court. *See New York Power Auth. v. United States*, 42 Fed.Cl. 795, 801 (1999) ("[T]his court cannot hear claims based on violations of the due process or equal protection clauses of the Fifth or 14th Amendments because no language in those clauses requires the payment of damages for violations of the amendments.") (citing *Montalvo v. United States*, 231 Ct.Cl. 980, 982–3, 1982 WL 25825 (1982)).

The breach of contract plaintiffs assert is the failure to provide a hearing under 34 C.F.R. § 668, subpart G, before temporarily stopping payments. Such hearings are required when an institution has "received written notice of a final audit or program

8. It is unnecessary to separately address the alleged violation of law. It would either result in a demand for purely equitable remedies, over which we have no relevant jurisdiction, return of program funds, which plaintiffs do not seek, or in contract damages, which we treat below.

9. Although we might have jurisdiction to hear a claim for payments due as a matter of law, that is not plaintiffs' complaint. The payments were delayed, not omitted altogether.

review determination and ... desires to have such determination reviewed by the Secretary." 20 U.S.C. § 1094 (2002).

The contract claim is unusual in that plaintiffs' rights, in substance, derive from regulations and would normally be enforced through administrative remedies. If plaintiffs are entitled to a hearing prior to termination of payments, the remedy presumably would be the required hearing. Equitable relief would be superfluous at this stage, however. Hence plaintiffs' claim money damages under the Tucker Act. 28 U.S.C. § 1491 (2000). This court routinely hears contract claims and defendant concedes that the agreement is a contract. Nevertheless, the contract "right" plaintiffs seek to enforce, although incorporated into a contract, comes from the applicable regulations.

We begin with defendant's contention that the appropriate standard of review, despite the fact that this is a contract claim, is the limited one contemplated by the Administrative Procedures Act ("APA"). *See* 5 U.S.C. 706(2)(A) (1996). Namely, the agency's determination will be overturned only where the agency has exceeded its statutory authority, or is arbitrary, capricious, or abuses its discretion. Defendant cites *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985),[10] *Town of Fallsburg v. United States*, 22 Cl.Ct. 633 (1991)[11] and *Doty v. United States*, 24 Cl.Ct. 615 (1991).[12] The agency "determination" defendant seeks to partially insulate through this limited review is the decision that the school

was "closed." The only issue, per defendant, is whether there was a rational basis for DOE to come to that conclusion. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). If this decision passes scrutiny, according to defendant, then there can be no breach of contract. Plaintiffs counter that the court must exercise *de novo* review of DOE's action because the claim is for breach of contract.

Given the Kafka-esque nature of the bureaucratic bungling reflected in the record, it is conceivable that defendant would not be rescued by a more limited scope of review. For the reasons set out below, however, we conclude that it is unnecessary to address this issue. Whether or not defendant improperly treated the school as closed, and thus improperly deprived it of the right to a hearing, the material problem for plaintiffs in this proceeding is that the agreement, even if viewed in traditional contract terms, does not, as a matter of law, permit the recovery of the type of damages they seek.

We begin by making certain assumptions. We will assume that the failure to provide a hearing constituted a violation of 34 C.F.R. § 668.86, and hence constituted a breach of the agency's agreement to adhere to the law. Implicit in this is the additional assumption that, even under an APA standard of review, the agency was arbitrary and capricious in its judgment that the school had elected to close, within the meaning of the termination

---

10. *Bennett* involved the implementation of educational grant agreements. The Court concluded that such arrangements should not be viewed through a traditional contract prism. Hence agreement language incorporating parts of the grant program should not be narrowly construed against the government.

11. In *Fallsburg*, we considered a federal grant program incorporating applicable federal regulations to an EPA contract. *Id* at 641, 1991 WL 30386. The contract involved an upgrade to a sewage plant pursuant to the Clean Water Act, 33 U.S.C. §§ 1251–1376, 1281(g)(1) (2002) ("CWA"). The CWA required compliance with EPA regulations in order to retain the available grants. We applied the APA standard of arbitrary, capricious or contrary to law to evaluate the agency's decision *under the contract* not to make payments to reimburse the town for expen-

ditures. The agency had determined that the town had violated certain regulations concerning conflict of interest in oversight of subcontractors.

12. Defendant's reliance on *Doty* is misguided. The facts presented to the court are not analogous to the ones here. *Doty* involved a claim resulting from the Dairy Termination Program (DTP) under the Commodity Credit Corporation Charter Act ("CCC"), 15 U.S.C. § 714 (2002). Plaintiff alleged that he had not been adequately compensated for the slaughter of his dairy cattle. An administrative review at the county, state and national level ensued. A full administrative record was compiled for the court. Furthermore, the CCC included language which severely limited review by this court. *Doty*, 24 Cl.Ct. at 625. Here, no administrative record has been compiled for our review. Furthermore, the statute at issue here does not limit our review.

clause.[13] We will further assume that the plaintiffs could prove that the breach is causally and foreseeably connected to the closure of the school and to economic losses to plaintiffs.

But what was the parties' agreement? Or, more relevant, what obligations and liabilities did DOE expose itself to when it executed the agreement? We believe that it agreed to do no more than abide by the law. *See American Hosp. Ass'n v. Schweiker*, 721 F.2d 170 (7th Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984);[14] *See also Maryland Dept. of Human Resources v. Dept. of Health and Human Serv.*, 763 F.2d 1441, 1449 (D.C.Cir.1985).[15] Admittedly this means that DOE agreed to comply with regulations requiring a hearing before terminating payments under certain conditions. We have assumed the failure to offer the hearing was a violation of the regulation and hence a breach. But does this mean that, in signing the agreement, that the agency opened itself up to traditional contract remedies? We think not.

The regulations provide that "[a]n institution may participate in any Title IV, HEA program ... only if the institution enters into a written program participation agreement with the Secretary, on a form approved by the Secretary. A program participation agreement conditions the initial and continued participation ... upon compliance with the provisions of this part." 34 C.F.R. § 668.14(a)(1). The Agreement, therefore, was only contractual in this limited sense. It was the synapsis between the school and the Pell Grant program. Absent the agreement,

the regulations were only potentially available. SJCC's right to obtain payments and to the procedural protections of the program required the formality of a signed agreement which did no more than make the regulations applicable to the school.

Plaintiffs point to no negotiations which suggest anything other than plaintiffs' application for access to a traditional government remedial program, subject to all the rights, procedures, and obligations imbedded therein, and the agency's approval of that application. There is no reason to think that the agency contemplated any commitment other than that set out in the regulations. The agency's commitment, in short, was to do what the regulations required. The regulations, however, embody their own limited remedy for "breach"-namely, either an administrative appeal, as provided for in 34 C.F.R. § 668.111–121, or a suit in the district court seeking declaratory or injunctive relief. *See Chauffeur's Training Sch. v. Riley*, 967 F.Supp. 719, 729 (N.D.N.Y.1997) (examining whether plaintiff had been given the appropriate hearing under 34 C.F.R. § 668.116).[16] In either event, the only "monetary" remedy would have been the restoration of payments. It follows that the parties never agreed to bind the agency to exposure to consequential damages.

Administrative remedies were, at least theoretically, open to plaintiffs in the spring of 1995. If plaintiffs had known of the misunderstanding, they could have obtained administrative relief, or, if necessary, a court order. Like any other challenge to agency action, the remedy, assuming plaintiffs could have

**13.** The agency's argument that it properly concluded that the school was closed is strained. The agency's own conduct belies its contention that it treated the school as closed. A final audit/program review is required whenever a school closes. *See* 34 C.F.R. § 668.26(b)(2). There is no evidence that a final audit or program review was ever initiated.

**14.** In addressing a grant program under Title VI of the Public Health Service Act, 42 U.S.C. §§ 291, 300 *et seq.* (1976) ("Hill–Burton Act"), the *Seventh Circuit* determined that the relationship between hospitals who received grants under that act and the government was not a contractual one. Instead it found that the conditions of the grant were based on statutory re-

quirements. The court reasoned that the "contract analogy thus has only limited application." *Id.* at 182.

**15.** Interpretation of parties' agreements under federal grant programs "turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties." *Id.*

**16.** The Court of Appeals for the District of Columbia found that a grant-aid program, whereby the State of Maryland received funds for educational programs, was not a contract under the meaning of the Tucker Act and the federal governments' actions with respect to the agreement were appropriately reviewed under the APA.

shown entitlement, would be treated as complete. Absent some special statutory or regulatory provision, the violation would not spawn collateral money damages.

It is no answer to suggest that plaintiffs' unawareness of the misunderstanding made this a tardy remedy, thereby creating additional liability for contract damages. While the court is sympathetic to plaintiffs here, creating a separate remedy under these circumstances would, in effect, be to create a remedy for what amounts to agency negligence. We are foreclosed from doing so, in our judgment, by the limited nature of the statutes and regulations applicable to educational loan programs. We rule that, as a matter of law, violation of the agreement, insofar as it involves a failure to offer a hearing under 34 C.F.R. § 668.86, creates a right only to equitable relief.

The Supreme Court's decision in *Bennett* is helpful. *Bennett*, 470 U.S. 656, 670, 105 S.Ct. 1544. There the Court taught that, "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Id* at 670, 105 S.Ct. 1544. The normal confines of "bilateral contract governing a discrete transaction" are not appropriate for a contract incorporating federal grants. *Id.*

Although the Court was dealing with a different program and a different legal question, we believe the same caution should apply in this instance. Any other ruling would have no limitations inherent to this educational loan program. Every violation of an agreement to abide by the law would carry the same risk of collateral damage. If Congress wished to expand government liability for what amounts to routine, albeit perhaps erroneous, administrative decision making, it must do so more clearly.

## CONCLUSION

Defendant's motion for summary judgment is granted. Plaintiffs' motion for summary judgment is denied. The Clerk is directed to dismiss the complaint with prejudice. No costs.