# United States Court of Appeals for the Federal Circuit

03-5180

SAN JUAN CITY COLLEGE and
AMERICO REYES MORALES, (on his own behalf and
as President of SAN JUAN CITY COLLEGE INC.),

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Yolanda R. Gallegos, Gallegos Legal Group, of Albuquerque, New Mexico, argued for plaintiffs-appellants.

Hillary A. Stern, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Mark A. Melnick, Assistant Director.

Appealed from: United States Court of Federal Claims

Senior Judge Eric G. Bruggink

# United States Court of Appeals for the Federal Circuit

03-5180


SAN JUAN CITY COLLEGE and
AMERICO REYES MORALES, (on his own behalf and
as President of SAN JUAN CITY COLLEGE INC.),

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  December 9, 2004

_____


Before NEWMAN, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and SCHALL, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

The petitioners San Juan City College, Inc. and Americo Reyes Morales, President of the College (collectively, "the College"), contend in this suit for damages that the United States Department of Education ("the Department") breached a contract with the College to provide student aid funds.  The United States Court of Federal Claims granted summary judgment dismissing the complaint on the ground that, under the particular contract and as a matter of law, the College cannot recover damages for a breach.  San Juan City Coll., Inc. v. United States, 58 Fed. Cl. 26, 30 (2004).  We reject that conclusion, vacate the dismissal of the suit, and remand with instructions to decide,

first, whether the Department breached the contract with the College and, second, if a breach did occur, what damages, if any, the College may recover.

I

A. The underlying facts, as the Court of Federal Claims stated them, are undisputed. From 1977 until it closed permanently in 1996, the College was a private, for profit, post-secondary educational institution, operating several campuses in Puerto Rico and primarily serving low-income students. 58 Fed. Cl. at 27. In 1984, the College entered into a Program Participation Agreement ("the Agreement") with the Department to participate in student financial aid programs under the Higher Education Act, Pub. L. No. 89-329, 79 Stat. 1219 (1965) (codified as amended at 20 U.S.C. §§ 1070 et. seq.) ("Title IV"), including the Pell Grant Program under 20 U.S.C. § 1070a (2000). 58 Fed. Cl. at 27. At oral argument, the College described these federal funds as the "lifeblood" of the institution, critical to its continued operation.

In February 1995, representatives of the Puerto Rico tax office made an unannounced visit to the College campuses to conduct an inventory related to an alleged tax debt. The tax officials padlocked the school's doors, forcing students to leave and the College to suspend all classes for approximately two weeks between February 8 and February 25. At the end of this temporary recess, the padlocks were removed and students returned. The College resumed classes on February 27, and later made up all missed classes by extending the term. Id.

On or around February 14, 1995, Department officials sent by certified mail, return receipt requested, a "closed school letter" to the College stating that the Department had been "advised" that the College had "ceased operations at all its

branches effective on February 6, 1995," and indicating that the Department regarded the College as permanently closed. Id. at 28. Subsequently, the Department placed the College on its "closed school list," issued a "freeze memo" instructing that Title IV funds be withheld from the College because "INSTITUTION CLOSED EFFECTIVE FEBRUARY 6, 1995," and stopped processing reimbursement requests from the College. Id. (The Department contends that under 34 C.F.R. § 668.26(a)(1), the College ceased to qualify for Title IV funding when it temporarily shut down for the inventory and thus "close[d] or stop[ped] providing educational programs for a reason other than a normal vacation period or a natural disaster . . ." 58 Fed. Cl. at 28.)

It is "undisputed" that the College never received the February 14 letter; the government did not produce the return receipt for the certified mailing. Id. Instead, at some point between February 27 and March 23, the College ceased receiving expected Title IV funds and learned that it had been placed on the closed school list. The College immediately began challenging that action. Between March 23 and June 12, the College and its counsel called and wrote to various Department officials numerous times to inform them that the College was not closed. Id. at 28-29. Despite these efforts, there is no evidence that any Department employee independently verified that the College was open until late June of 1995, after Puerto Rican Congressman Carlos Romero-Barceló had written to the Secretary of Education about the matter. Id. at 29.

In July 1995, the Department advised the College that it had confirmed that the College was open and operating. Shortly thereafter, the Department removed the College from the closed school list and resumed providing Title IV funds. Id. In July 1995, the Department also paid all funding requests received from the College since

February 10, 1995.  Appellee's Br. at 10; J.A. at 111, 171.  In 1996, the College closed permanently.  58 Fed. Cl. at 27.

B.  In February 2001, the College filed the present suit in the Court of Federal Claims.  The complaint contained three counts.  Count One alleged that the Department breached the Agreement by withholding Title IV funding for six months without "follow[ing] the notice and hearing requirements of 20 U.S.C. § 1094 and 34 C.F.R. § 668, Subpart G."  The complaint then stated:

> 40.  Defendants' breach of contract resulted in Plaintiffs suffering severe and substantial damages including, but not limited to, lost profits Plaintiffs would have earned had it not been forced by ED to close.
> 41.  Such damages were foreseeable to Defendants at the time they entered into the program participation agreement with SJCC.

J.A. at 30.

Count Two alleged that the defendants had violated Title IV of the Higher Education Act of 1965, 20 U.S.C. §§ 1070 et seq., "[b]y failing to provide SJCC with the notice and hearing required by 20 U.S.C. § 1094 and 34 C.F.R. § 668, Subpart G, when it ceased providing funding to SJCC beginning in February 1995[.]"  Count Two then repeated the allegations of Count One quoted above regarding the damages the plaintiffs had suffered from "[s]uch violation" and the foreseeability of those damages. J.A. at 31.  Count Three alleged that these actions by the Department constituted a taking of the plaintiffs' property, for which they sought just compensation.  J.A. at 31-32. The prayer for relief sought declaratory relief and "damages including consequential damages for lost profits resulting from Defendants' actions[.]"

C.  On cross motions for summary judgment, the court granted the government's motion and dismissed the suit.  The court stated that the College made a "compelling case that [the Department] breached the agreement," as well as a "powerful argument" that the temporary withholding of funds "foreseeably caused dramatic economic consequences to plaintiffs — to wit, closing of the school."  58 Fed. Cl. at 27.  The court found it unnecessary to determine whether the Department had breached the Agreement, however, because it concluded that "as a matter of law, violation of the agreement, insofar as it involves a failure to offer a hearing under 34 C.F.R. § 668.86, creates a right only to equitable relief."  Id. at 32.  "[T]he agreement, even if viewed in traditional contract terms, does not, as a matter of law, permit the recovery of the type of damages they seek."  Id. at 30.

The court stated that "the contract 'right' plaintiffs seek to enforce, although incorporated into a contract, comes from the applicable regulations", id. at 7, and that the Agreement "did no more than make the regulations applicable to the school."  Id. at 31.  According to the court, when the Department "executed the agreement . . . it agreed to do no more than abide by the law."  Id.  The court ruled that "in signing the agreement" the Department had not "opened itself up to traditional contract remedies[.]"  Id.  The court further stated:

> There is no reason to think that the agency contemplated any commitment other than that set out in the regulations. The agency's commitment, in short, was to do what the regulations required.  The regulations, however, embody their own limited remedy for "breach" – namely, either an administrative appeal, as provided for in 34 C.F.R. § 668.111-121, or a suit in the district court seeking declaratory or injunctive relief . . . .  It follows that the parties never agreed to bind the agency to exposure to consequential damages . . . .  We rule that, as a matter of

law, violation of the agreement, insofar as it involves a failure to offer a hearing under 34 C.F.R. § 668.86, creates a right only to equitable relief.

Id. at 31-32.

The court also rejected the College's claim that the Department denied it due process by terminating its participation in the Title IV Program without a hearing because the court has no jurisdiction over damage claims based on due process violations. Id. at 29. The court did not discuss or explicitly rule on the College's taking claim or its allegation of statutory violations, but it necessarily rejected those claims when it dismissed the complaint. Since the College in its appeal challenges only the denial of its breach of contract claim, we need not consider or discuss the dismissal of those other claims.

II

Without deciding whether the Department had breached the Agreement, the Court of Federal Claims dismissed the suit seeking damages for such breach on the ground that damages were not available as a remedy for such breach, and that the only remedy was equitable relief. Although there might be cases in which a court appropriately may dismiss a suit for breach of contract without adjudicating the merits because there is no theory of damages on which the plaintiff could recover, cf. Albemarle Bank & Trust Co. v. United States, 12 Cl. Ct. 704, 706-07 (1987), this is not such a case.

A. The governing statute requires, as do the Department's regulations, that educational institutions seeking to participate in the Title IV student financial aid programs under the Higher Education Act must enter into "a program participation

03-5180                                6

agreement with the Secretary," which "shall condition the initial and continuing eligibility of an institution to participate in a program upon compliance with" numerous specific and detailed requirements the statute lists. 20 U.S.C. § 1094(a); see also 34 C.F.R. § 668.14 ("An institution may participate in any Title IV, HEA program, other than the LEAP and NEISP programs, only if the institution enters into a written program participation agreement with the Secretary" and listing conditions to which the institution agrees by entering said agreement).

Pursuant to these requirements, the College and the Department entered into a formal written "Program Participation Agreement," consisting of 11 articles setting forth detailed requirements and signed by both parties. Although it may well be, as the Court of Federal Claims stated, that most (and perhaps all) of these contractual provisions were required by and incorporated the governing regulations, that does not make them any less contractual obligations or provisions, or constitute a valid reason for not treating them as such.

We see nothing in either the Agreement itself or in the governing statute or regulations that supports the Court of Federal Claims' view that the parties understood that damages would not be available in the event of breach. Normally contracts do not contain provisions specifying the basis for the award of damages in case of breach, with the exception of provisions governing damages in particular situations, such as liquidated damages for delay or other specified breaches.

The fact that this contract covers government financial grants does not warrant a different standard. If the government has breached the Agreement, the College is entitled to seek whatever damages it is entitled to receive. As this Court has stated, "in

03-5180                                7

the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement. Indeed, as a plurality of the Supreme Court noted in <u>United States v. Winstar Corp.</u>, 518 U.S. 839 (1996), 'damages are always the default remedy for breach of contract.'" <u>Sanders v. United States</u>, 252 F.3d 1329, 1334 (Fed. Cir. 2001) (citing and quoting <u>Winstar Corp.</u>, 518 U.S. at 885 (parallel citations omitted)).

B. The Court of Federal Claims deemed "helpful" the Supreme Court's decision in <u>Bennett v. Kentucky Department of Education</u>, 470 U.S. 656, 669 (1985). The trial court stated that there "the Court taught that, '[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy.' <u>Id.</u> at 670. The normal confines of 'bilateral contract governing a discrete transaction' are not appropriate for a contract incorporating federal grants. <u>Id.</u>" 58 Fed. Cl. at 32.

However, "[i]t is a truism that bears repeating that broad language in an opinion must be read in light of the issue before the court." <u>N. States Power Co. v. United States</u>, 224 F.3d 1361, 1367 (Fed. Cir. 2000) (citing <u>Armour & Co. v. Wantock</u>, 323 U.S. 126, 133 (1944)). As the Court of Federal Claims itself recognized, in <u>Bennett v. Kentucky</u> "the [Supreme] Court was dealing with a different program and a different legal question." 58 Fed. Cl. at 32; <u>see</u> <u>Bennett v. Kentucky</u>, 470 U.S. at 669.

<u>Bennett v. Kentucky</u> involved monetary grants that the Department had made to the state of Kentucky under Title I of the Elementary and Secondary Education Act of 1965, 20 U.S.C. § 2701 <u>et.</u> <u>seq.</u>, "to support compensatory education programs for disadvantaged children. In order to assure that federal funds would be used to support

03-5180                                                8

additional services that would not otherwise be available, the Title I program from the outset prohibited the use of federal grants merely to replace state and local expenditures." 470 U.S. at 659. In <u>Bennett v. Kentucky</u> the Department sought to recover funds it had disbursed to the state, on the grounds that the state had misused funds meant "to supplement, and not to supplant, state and local expenditures for education." 470 U.S. at 658.

The question before the Supreme Court was whether, in "excus[ing] the State from repayment on the grounds that there was no evidence of bad faith and the State's programs complied with a reasonable interpretation of the law[,]" the court of appeals had applied an erroneous standard of review. <u>Id.</u> at 659. The Supreme Court reversed "because we disagree with the standard adopted by the Court of Appeals[.]" <u>Id.</u>

There is nothing in <u>Bennett v. Kentucky</u> that indicates, or even suggests, that in implementing the different federal grant programs there involved, a formal written contract, comparable to the one executed in this case, had been breached by the Department or the state recipient. The outcome of <u>Bennett v. Kentucky</u> turned on the Supreme Court's interpretation of the applicable statutory provisions and the governing regulations. There was no issue or ruling regarding a breach of contract.

The Supreme Court's statements, upon which the Court of Federal Claims relied, were made in explaining why the Supreme Court did "not believe that ambiguities in the requirements should invariably be resolved against the Federal Government as the drafter of the grant agreement." 470 U.S. at 669. Although the Court referred to the "grant agreement," in view of the lack of reference in the opinion to any formal agreement, we believe the Court used that term (as well as its use of the same term on

page 670) as a shorthand description of the obligations the parties assumed by participating in the grant program. See id. at 669-70. Nothing in the opinion indicates that "agreement" was comparable to the formal written agreement between the College and the Department.

In the companion case to Bennett v. Kentucky, Bennett v. New Jersey, 470 U.S. 632 (1985), the Supreme Court "acknowledged that Title I, like many other federal grant programs, was 'much in the nature of a contract.'" 470 U.S. at 638 (citing and quoting Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981)). The Court of Federal Claims' ruling in the present case stands that theory on its head. There is no reason to believe that, because federal grant programs may be "in the nature of a contract," special and different rules govern the determination of damages for a breach of a formal written contract that involves a federal grant of funds to educational institutions.

C. As noted, the prayer for relief in the complaint sought "damages including consequential damages for lost profits." In its briefs the College contends that it is entitled to recover lost profits and the government argues that lost profits cannot be recovered here. For several reasons, we find it unnecessary to resolve that question in this appeal.

The recovery the College seeks is not limited to lost profits, but more broadly encompasses other types of damages as well. Count I of the complaint alleged that the Department's breach of the agreement caused the College "severe and substantial damages including, but not limited to lost profits . . . ." Count II repeated this language

03-5180                                    10

as part of the allegation that the Department had violated Title IV. Similarly, the prayer for relief sought "damages including consequential damages for lost profits . . . ."

Moreover, it would be premature to decide whether the College could recover lost profits unless and until the Court of Federal Claims decides the Department breached the agreement. If the court were to hold that there had not been a breach, there would be no need or occasion to determine what damages, if any, the College could recover for a breach. Indeed, the issue of lost profits arises in this appeal only because the Court of Federal Claims put the cart before the horse when it held, as a matter of law, that the College could not recover any damages and therefore it was unnecessary to determine whether a breach of contract occurred.

Finally, the record on damages is inadequate to permit an informed judicial determination on the recoverability of lost profits. The recoverability of lost profits frequently is a close and difficult issue that turns upon the facts of the particular case. See, e.g., Litman v. Mass. Mut. Life Ins. Co., 739 F.2d 1549, 1559 (11th Cir. 1984); E. Airlines, Inc. v McDonnell Douglas Corp., 532 F.2d 957, 998-1000 (5th Cir. 1976); see also Cal. Fed. Bank, FSB v. United States, 245 F.3d 1342, 1350 (Fed. Cir. 2001) (noting importance of material facts). There has been no discovery on damages, and there is no way of knowing what evidence the College could develop and present on the issue. At this stage of the proceedings, we cannot say that there are no facts that could support an award of lost profits. The answer to that question must await the development of a complete record on the subject.

If on remand the Court of Federal Claims determines that the Department breached the Agreement, and after a full factual record on the damages question has

been developed, the trial court then will be in a position to decide whether, under the traditional principles that govern the recovery of lost profits, cf. Cal. Fed. Bank, 245 F.3d at 1349-50, the College is entitled to recover them. We of course express no views on that issue.

III

Since this case will return to the Court of Federal Claims to decide initially whether the Department breached the Agreement, we think it appropriate to mention a few points that the court should consider in making that determination.

A. As noted, the College's breach of contract theory is that the Department's termination of the College's participation in the Title IV funding "was in breach of its contract with [the College] requiring [the Department] to follow the notice and hearing requirements of 20 U.S.C. § 1094 and 34 C.F.R. § 668, Subpart G." Complaint, ¶ 39. The College relies upon Article X.3 of the Agreement, which states:

> The Secretary may terminate this Agreement or the Institution's participation in one or more of the programs covered by this Agreement under the Student Assistance General Provisions regulations, 34 C.F.R. Part 668, Subpart G, "Fine, Limitation, Suspension, and Termination Proceedings."

The cited regulation provides that the Secretary "may limit or terminate any institution's participation in a Title IV" program by first "sending an institution . . . a notice by certified mail, return receipt requested" that, among other things

> Informs the institution or servicer that the limitation or termination will not be effective on the date specified in the notice if the designated department official receives from the institution or servicer, as applicable, by that date a request for a hearing or written material indicating why the limitation or termination should not take place[.]

34 C.F.R. §§ 668.86(a) & (b)(1)(iii) (2004).

The regulation further provides that "[i]f the institution . . . does not request a hearing but submits written material," the Department will decide the matter and notify the institution "after considering that material."  34 C.F.R. § 668.86(b)(2).

The regulation thus in terms requires the Department to hold a hearing before terminating or suspending an institution's participation in Title IV programs only if the institution requests one.  Nothing in the record before us shows that the College requested a hearing and we do not know whether it did.  If it did not, it would seem that the Department had no contractual obligation to hold one.

There may be the further question of whether the Department's failure to give notice of its proposed termination in accordance with the regulation waived the hearing-request requirement.  A related question is whether, even though the Department did not give timely or proper written notice, the regulation required the College to request a hearing once it was informed of the Department's suspension of funding.

With respect to the College's contention that the Department violated the "notice and hearing requirements of 20 U.S.C. § 1094," that section states:

> (1)  An institution that has received written notice of a final audit or program review determination and that desires to have such determination reviewed by the Secretary shall submit to the Secretary a written request for review not later than 45 days after receipt of notification of the final audit or program review determination.
> (2)  The Secretary shall, upon receipt of written notice under paragraph (1), arrange for a hearing and notify the institution within 30 days of receipt of such notice the date, time, and place of such hearing.  Such hearing shall take place not later than 120 days from the date upon which the Secretary notifies the institution.

20 U.S.C. § 1094(b) (1999). That provision appears to address a quite different issue than the suspension of funding here involved, namely, "a final audit or program review determination" that the institution wishes the Secretary to review after a hearing.

In its reply brief the College argues that the government's position "would have this Court disregard the plain language of 20 U.S.C. § 1094(c)(1)(F) and (G) requiring that [the Department] be permitted to terminate a school's participation in the Title IV programs only where it provides such school a hearing." Subsection (F), however, does not require the Secretary to hold a hearing but only to provide "reasonable notice and opportunity for hearing." § 1094(c)(1)(F). Subsection (G), which deals with "an emergency action" by the Secretary, does not mention a hearing at all. It only states that the Secretary "shall provide the institution an opportunity to show cause, if it so requests, that the emergency action is unwarranted." § 1094(c)(1)(G). Finally, the provision of the Agreement (Article X.3) upon which the College relies as incorporating the hearing requirement refers only to subpart G of the regulations, and not to the statute.

B. The Court of Federal Claims stated in its Order of April 21, 2003 that "[i]t is undisputed that the funds earned by the school prior to the cessation of reimbursement have been repaid." San Juan City Coll., Inc. v. United States, No. 01-73C (Fed. Cl. Apr. 21, 2003) (order). Accordingly, this case apparently involves not the termination of participation in Title IV funding (as the College alleges), but a delay in or suspension of such funding.

Even if the Agreement requires the Department to conduct a hearing before terminating participation in a Title IV program, does the Agreement also require a

hearing before payments under the program may be delayed?  Is there anything in the regulations that specifies the time period within which the Department must make payments to a participating institution?

The hearing requirements of Part G of 34 C.F.R. § 668 cover not only proceedings to terminate an institution's participation in the Title IV program, but also proceedings to suspend it.  Quaere, did the Department's action in this case constitute a suspension of participation within the meaning of subpart G?  The College has not so argued here.  Instead, it contends only that the Secretary improperly terminated its participation in the program without a hearing.  We leave further elucidation of this issue to the Court of Federal Claims.

C.  The issues we have discussed in parts A and B above were suggested by our consideration of this case.  We intimate no views on how those questions should be resolved.  There may be other factual and legal issues that are relevant to the determination whether the Department breached the agreement.

## CONCLUSION

The summary judgment of the Court of Federal Claims dismissing the complaint is vacated.  The case is remanded to that court to determine first, whether the Department breached the agreement.  If the court finds that the Department did so, then it should determine what damages, if any, the College is entitled to recover.  The court may, if it deems it appropriate, bifurcate the liability and damages issue.

## VACATED AND REMANDED